Anthony D'AGOSTINO, Sr., and Tochrisand, Inc., d/b/a Lincoln Restaurant, Plaintiffs,

v.

NEW YORK STATE LIQUOR AUTHORITY, Thomas A. Duffy, Jr., Frank N. Cuomo, Paul Shibley, John M. MacCallum, and David Paul, Defendants.

No. 92–CV–6356L.

United States District Court,
W.D. New York.

Jan. 30, 1996.

Frank A. Aloi, Mendon, NY, Kevin Bambury, Rochester, NY, for Anthony D'Agostino, Sr., Tochrisand, Inc.

Anthony D'Agostino, Sr., Brockport, NY, pro se.

Elizabeth J. McDonald, Office of New York State, Attorney General, Rochester, NY, for New York State Liquor Authority, Thomas A. Duffy, Jr., Frank N. Cuomo, Paul Shibley, John M. MacCallum.

Edwin Robert Schulman, Rochester, NY, for David Paul.

Edward H. Fox, Harris, Beach & Wilcox, Rochester, NY, for Robert Milby.

## DECISION AND ORDER

LARIMER, Chief Judge.

This action, which is brought under 42 U.S.C. §§ 1983 and 1985, arises out of plaintiffs' former operation of a bar and restaurant known as the Lincoln Restaurant ("the Lincoln") in Brockport, New York. Plaintiff Anthony D'Agostino, Sr., ran the Lincoln

through plaintiff Tochrisand, Inc., a corporation of which he is the president and sole director. Plaintiffs contend that defendants conspired together to deprive them of their civil rights in various ways in order to drive the Lincoln out of business.

Defendants include David Paul, who ran a business near the Lincoln at the times in question, and five "State defendants": the New York State Liquor Authority ("SLA"); Thomas A. Duffy, Jr.; Frank N. Cuomo; Paul Shibley; and John M. MacCallum. The four individual State defendants were all SLA officials at the relevant times, but are sued in their individual capacities only. The State defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## BACKGROUND

The thirty-seven-page amended complaint relates a long-running feud between D'Agostino and David Paul, who at all relevant times ran a beauty parlor/barber shop, and rented apartments, in a building adjacent to the Lincoln. The history of this dispute is a tortuous one, but is relevant to the various roles played by defendants and hence to their potential liability.

Plaintiffs allege that beginning in 1988, Paul began making false accusations about the Lincoln and D'Agostino to Brockport residents, the local police, and the SLA. Paul allegedly falsely accused the Lincoln of being rat-infested, in violation of noise ordinances and in violation of laws prohibiting the sale of alcohol to minors, and so on. Paul's alleged motive was to force plaintiffs out of business so that Paul could buy the Lincoln for himself.

In April 1988, Paul, as "spokesperson" for the "Concerned Citizens of Brockport," submitted a petition signed by over 100 Brockport residents to the SLA complaining about noise and other problems relating to several bars in downtown Brockport. Complaint Ex. 21(b).[1] The cover letter, signed by Paul, stated that the "problems at the present time are mainly with the Lincoln Bar, on King Street."

In response to this petition, Gary Bartikofsky, an SLA investigator, conducted an investigation of the complaints. The substance of his conclusions was that some neighborhood residents had complaints about the Lincoln (mostly noise-related); that some had concerns about the rowdy behavior of local college students in general, but no complaints about the Lincoln in particular; and that "many of the problems brought forth [in the investigation] could be attributed to an on-going dispute" between D'Agostino and Paul. Complaint Ex. 21(b), (c).

On September 19, 1988, the SLA served D'Agostino with a notice directing him to appear the following month in connection with proceedings to revoke his liquor license, and to plead to two charges: that he had committed an assault, and that noise or other disturbances occurred at the Lincoln in violation of SLA regulations. Affirmation of Kevin Bambury, Esq., Ex. B.

The assault charge related to an incident between D'Agostino and Paul on April 1, 1988. D'Agostino was arrested on that date and charged with assault. At trial in November 1988, he was acquitted of assault but found guilty of harassment. On June 13, 1990, that conviction was vacated by Sweden Town Justice Fremont Clow. Complaint Ex. 21(v).[2]

D'Agostino pleaded not guilty to the SLA charges, and his hearing was eventually set for August 24, 1989. The hearing was held before defendant John MacCallum, an SLA Deputy Commissioner serving as an Administrative Law Judge ("ALJ"). Robert Bolm, Esq., appeared for the SLA, and Robert J.

---

1. It appears that the exhibit numbers on the documents attached to the complaint may have been written in connection with a deposition or other prior proceeding. Most of them bear the numeral "21," followed by a lower case letter in parentheses. The letters are in alphabetical order, although there are some gaps (*e.g.*, there is no exhibit 21(p)).

2. Justice Clow did not state the basis for the decision, but statements made by counsel at D'Agostino's SLA disciplinary hearing in July 1990 indicate that the harassment conviction was vacated because harassment is not a lesser included offense of assault under New York law. *See* Complaint Ex. 21(aa) at 8–9.

Lunn, Esq., for D'Agostino. Paul did not appear, having gone away on vacation.

The parties put on the record the terms of a plea agreement that they had worked out. Under that agreement, the assault charge would be withdrawn, and D'Agostino would plead no contest to the noise charge. The parties also agreed that the Lincoln's license would be suspended for no more than fifteen days.

On February 16, 1990, however, Bolm wrote to Lunn and advised him that the SLA Licensing Board ("the Board") had informed him that charges could only be withdrawn at the request of an SLA attorney, not a defense attorney, and then only on the ground that "a wrong charge was brought or that there is absolutely no evidence to support the charge." Complaint Ex. 21(o). Bolm stated that because D'Agostino had been convicted of harassment (that charge having not yet been vacated), the Board would not grant a request to withdraw it. He stated that D'Agostino could either go ahead with a hearing on both the assault and noise charges, or have a hearing on the former followed by an unconditional no contest plea to the latter.

Previous to this letter, on February 2, 1990, D'Agostino had applied to the SLA for permission to make various alterations to the Lincoln, including an expansion into an adjoining building. On March 28, 1990, defendant Paul E. Shibley, an SLA Deputy Commissioner, disapproved the application on the ground that "charges are pending against this licensee which may result in revocation or cancellation of this license." Complaint Ex. 21(q). Shibley stated that the pending charges "cause[d] concern as to the licensee's ability to comply with the requirements of the ABC Law and the Rules and Regulations of the Authority." Those charges were the assault and noise charges.

Plaintiffs then commenced an Article 78 proceeding in state court challenging the disapproval. On May 22, 1990, plaintiffs' then-attorney Frank A. Aloi, Esq., wrote a letter to Bolm, apparently reflecting some prior negotiations between the two attorneys, stating in essence that plaintiffs would withdraw their Article 78 proceeding if the SLA with-

drew its disapproval of the alteration application. Complaint Ex. 21(t). Two days later, Bolm sent a memorandum to defendant Frank N. Cuomo, an SLA Commissioner, advising him that "in [Bolm's] opinion, we will lose the Article 78," though he did not say why he thought so. Complaint Ex. 21(u).

The SLA did not agree to the proposed settlement. On June 13, 1990, Justice David O. Boehm of Supreme Court, Monroe County, rendered a decision holding that the disapproval of the alteration application was without rational basis, and, therefore, permitting plaintiff to go forward with the alterations. Complaint Ex. 21(w).

On July 18, 1990, the SLA went forward with the hearing on the assault and noise charges. Defendant MacCallum was the presiding ALJ. D'Agostino's attorney put on the record his opposition to the Board's decision that the withdrawal of the assault charge had been improper. He argued that the Board's stated conditions for withdrawal of a charge—a request by the SLA attorney based on a complete lack of evidence—had been met, since Bolm had joined in the request at the August 24, 1989 hearing, and because Paul, the alleged assault victim, had not appeared to testify.

On August 2, 1991, MacCallum issued his findings. He found that the assault charge was sustained by the evidence, but that the noise charge was not. MacCallum noted that D'Agostino had been acquitted of assault, but nevertheless concluded that the evidence (which included D'Agostino's admission that he struck Paul after Paul made a profane reference to D'Agostino's daughter) showed that D'Agostino had knocked Paul to the ground, and that "such behaviour [sic] on the part of the licensee is grossly improper and warrants administrative sanction." Defendants' Motion Ex. 2.

On January 2, 1992, pursuant to MacCallum's findings, the SLA issued an order suspending plaintiffs' license for forty-five days beginning February 18, 1992. Plaintiffs were also ordered to forfeit a $1000 bond that they had previously posted in connection with the disciplinary proceedings. Of the five Commissioners voting, three voted for a

forty-five day suspension and two for thirty days. Defendants Duffy and Cuomo were among the former (the other three Commissioners are not named as defendants). Complaint Ex. 21(cc).

Plaintiffs contend that this decision was without a rational basis. Plaintiffs allege that the Board was simply retaliating against plaintiffs out of anger at the State Supreme Court's reversal of the Board's denial of plaintiffs' alteration application.

Plaintiffs then obtained a stay of the suspension from the State Supreme Court, and commenced another Article 78 proceeding to annul the Board's action and to compel the Board to abide by the August 1989 plea agreement. On April 28, 1992, Supreme Court Justice Edmund A. Calvaruso issued a decision vacating MacCallum's findings on the assault charge and ordering that the August 24, 1989 plea be reinstated. Noting Bolm's prior letter to D'Agostino's attorney stating that the Board had informed him that "defense attorneys are not allowed to request withdrawal of charges," Justice Calvaruso stated that the transcript from the August 24, 1989 proceeding "evidence[d] the State Liquor Authority presented the structured plea, not the reverse." Complaint Ex. 25. The court also stated that the sequence of events, in which the SLA suddenly revoked its withdrawal of the assault charge shortly after D'Agostino had applied for permission to expand the Lincoln, was "suspicious" and "disconcerting."

The SLA appealed Justice Calvaruso's decision. The Appellate Division, Fourth Department, unanimously affirmed on September 30, 1994. Bambury Affirmation Ex. N.

Plaintiff also alleges that in early 1992, defendants, acting in concert, "orchestrated a public relations campaign against plaintiffs" to convince the public that the Lincoln would soon go out of business because of its troubles with the SLA. Plaintiffs contend that these rumors so severely damaged plaintiffs'

business that plaintiffs were forced to file a Chapter 11 bankruptcy petition in May 1992. Plaintiffs sold the business in 1993, allegedly as a result of this crippling of their business.

Based on these allegations, plaintiffs assert three causes of action. The first alleges that defendants, acting under color of state law, have deprived, and conspired to deprive, plaintiffs of their rights to due process and equal protection under the law.

The second claim asserts that one Robert Milby (named in the complaint as a defendant, but since dismissed by stipulation of the parties) made false accusations against plaintiffs in 1992, and that the State defendants, though they knew that Milby's charges were false, used them as a basis to suspend and refuse to renew plaintiffs' license in October 1992, thereby depriving plaintiffs of their rights to due process and equal protection. Paul is not named in the second cause of action.

The third claim asserts that defendant Paul has made false and malicious statements about plaintiffs and their business in order to damage plaintiffs' business.[3]

## DISCUSSION

### I. Claims for Injunctive Relief

The amended complaint requests an injunction ordering defendants to cease and desist from their alleged retaliation against and harassment of plaintiffs. Defendants contend that this claim should be dismissed because plaintiffs have sold their business, and thus there is no basis or need for injunctive relief.

In their response, plaintiffs agree that the claim for injunctive relief is now moot and should be dismissed. *See* Bambury Affirmation ¶ 5. Therefore, this aspect of defendants' motion is granted, and all claims for injunctive relief are dismissed.

In addition, I note that the amended complaint, unlike the original, does not

---

**3.** None of the individual claims cites any statute or particular theory of liability. The jurisdictional statement in the complaint does cite §§ 1983 and 1985, and refers to the court's pendent jurisdiction. The first and second causes of action, then, appear to assert claims under both § 1983

and § 1985. The third claim apparently arises only under state law, but what particular tort is alleged is unclear. Since only Paul is named in that claim, however, that issue need not be reached on this motion by the state defendants.

request damages against the SLA, but only against the individual defendants. Since damages are unavailable against the state in a civil rights action in any event, *see Will v. Michigan Dep't of State Police,* 491 U.S. 58, 66, 71, 109 S.Ct. 2304, 2310, 2312, 105 L.Ed.2d 45 (1989), all claims against the SLA are dismissed. *See Shaw v. State of California Dep't of Alcoholic Beverage Control,* 788 F.2d 600, 603–04 (9th Cir.1986) (state alcohol licensing authority properly dismissed from civil rights suit arising out of revocation of liquor license).

## II. Claims Against Defendant MacCallum

■ Defendants contend that the claims against defendant MacCallum should be dismissed because he is entitled to absolute judicial immunity from suit.

■ MacCallum's role in these events was solely in his capacity as an ALJ. It is well established that judges are absolutely immune from liability for acts committed within their jurisdiction. *See, e.g., Stump v. Sparkman,* 435 U.S. 349, 363, 98 S.Ct. 1099, 1108, 55 L.Ed.2d 331 (1978); *Pierson v. Ray,* 386 U.S. 547, 553–54, 87 S.Ct. 1213, 1217–18, 18 L.Ed.2d 288 (1967); *Fields v. Soloff,* 920 F.2d 1114, 1119 (2d Cir.1990). Absolute judicial liability has been extended to ALJs. *See Butz v. Economou,* 438 U.S. 478, 513–14, 98 S.Ct. 2894, 2914, 57 L.Ed.2d 895 (1978); *Tulloch v. Coughlin,* 50 F.3d 114, 116 (2d Cir. 1995).

Plaintiffs do not quarrel with these principles, but contend that they do not apply to the case at bar. Plaintiffs contend that MacCallum and the other defendants in this case are more comparable to the prison disciplinary officials who were held to be entitled only to qualified immunity in *Cleavinger v. Saxner,* 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985). Plaintiffs also assert that MacCallum can be held liable because he had no jurisdiction to hear the charges against D'Agostino after the SLA revoked the prior plea agreement.

I am not persuaded by these arguments. First, a review of the factors considered by the Court in *Cleavinger* does not support plaintiffs' position. Unlike the disciplinary procedures in that case, here plaintiffs were represented by counsel at the hearing before MacCallum. In addition, plaintiffs had greater procedural safeguards against erroneous, unlawful or unconstitutional decisions, as evidenced by their successful Article 78 proceedings. In addition, the hearing officer in *Cleavinger* acted under the direct supervision of a warden. 474 U.S. at 204, 106 S.Ct. at 502. Although the final decision on the penalty was up to the Board, there is no indication in this case that MacCallum acted in other than an independent capacity in his role as a factfinder. Under these circumstances, I find that he is entitled to absolute judicial immunity. *See Tulloch,* 50 F.3d at 117 (noting that prison hearing official "d[id] not have a level of independence commensurate with that enjoyed by judges or administrative law judges").

■ Plaintiffs' contention that MacCallum acted without jurisdiction is also not supported by the record. It is true that a judge may lose his immunity "when he has acted in the 'clear absence of jurisdiction.'" *Stump,* 435 U.S. at 357–58, 98 S.Ct. at 1105 (quoting *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 351, 20 L.Ed. 646 (1871)). Construing the record most favorably to plaintiffs, however, that did not occur here.

■ Plaintiffs maintain that because MacCallum was present when the initial plea agreement was put on the record in August 1989, he should have known that the SLA was bound by that agreement, and that the charges should not have been reinstated and rescheduled for a new hearing. At most, though, that shows only that MacCallum was in error, not that he lacked jurisdiction. That does not deprive MacCallum of immunity. The Supreme Court has stated that "a judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority ..." *Stump,* 435 U.S. at 357–58, 98 S.Ct. at 1105. *See also Fields,* 920 F.2d at 1119 ("[l]iability will not attach where a judge violated state law by an incorrect decision").

The relevant inquiry regarding immunity, then, is whether the judge acted in the "clear absence of all jurisdiction." *Stump,* 435 U.S. at 357–58, 98 S.Ct. at 1105. Clearly, MacCal-

lum had jurisdiction here. The matters before him involved charges brought by the SLA that could have affected plaintiffs' continued entitlement to a liquor license. Those are exactly the kind of charges that MacCallum had jurisdiction to hear. *See Green v. Maraio,* 722 F.2d 1013, 1017 (2d Cir.1983) (judge who has jurisdiction over subject matter of proceeding remains entitled to judicial immunity even if he acts in excess of that jurisdiction).

■ I also note that the complaint alleges that MacCallum, acting in concert with Paul and the other defendants, "orchestrated a public relations campaign against plaintiffs" aimed at eventually driving plaintiffs. out of business. The basis for this allegation is that defendants allegedly notified the Brockport Police Department that the Lincoln's license would be suspended for forty-five days beginning in February 1992, which "caused" the police to disseminate that information to the public at large, resulting in a diminution of plaintiffs' business.

Plaintiff does not appear to press this allegation on the motion *sub judice,* and I find no basis for it against MacCallum. Not only is there no evidence that the suspension notice was anything other than a form notice routinely sent out by the SLA in such cases, but there is no evidence that MacCallum had anything to do with issuing the notice.

### III. Claims Against Defendant Shibley

Defendant Shibley's involvement in this case was in denying plaintiffs' application for permission to make alterations to the Lincoln. He did so based on the fact that charges were pending against plaintiffs that could have resulted in plaintiffs' license being revoked or suspended.

■ Defendants do not contend, and I do not find, that Shibley is absolutely immune from liability for this act. The denial of the application was not an adjudicative act, but instead falls within the area of qualified immunity, under which "government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). *See also Stewart v. Lattanzi,* 832 F.2d 12, 13 (2d Cir.1987) ("If the official acts adjudicatively, the official probably has absolute immunity. If the official acts executively, the official probably has qualified good-faith immunity").

■ When the facts are undisputed, "the court [should] decide the issue of qualified immunity as a matter of law ..." *Warren v. Dwyer,* 906 F.2d 70, 76 (2d Cir.) (citation omitted), *cert. denied,* 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990); *accord Oliveira v. Mayer,* 23 F.3d 642, 649 (2d Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 722, 130 L.Ed.2d 627 (1995). In fact, the Supreme Court has stated that issues involving the defense of qualified immunity should ordinarily be decided "at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991). *See also Rodriguez v. Phillips,* 66 F.3d 470, 475 (2d Cir.1995) ("courts have encouraged the use of summary judgment as a procedural device to dispose early in the litigation process of those claims barred by qualified immunity"); *Castro v. United States,* 34 F.3d 106, 112 (2d Cir.1994) (qualified immunity defense "often can and should be decided on a motion for summary judgment")

■ In the instant case, I find that based upon the undisputed facts, Shibley is shielded by qualified immunity. The record shows that Shibley denied the application pursuant to SLA Divisional Order 589, which is dated January 9, 1968, and which states that "where revocation proceedings are pending, the Licensing Board shall disapprove the application ..." Defendants' Motion Ex. 1. The notice sent by the SLA to D'Agostino concerning the charges against him stated that the assault charge alleged that D'Agostino's conduct "was of such improper nature as to warrant revocation, cancellation, or suspension of said license ..." Bambury Affirmation Ex. B. Thus, the permit application clearly fell within the mandatory-denial provision of Order 589.

Plaintiffs' contention that Shibley "did not give any credence" to the prior plea agreement, *see* Plaintiff's Memorandum of Law at 4, is beside the point. It is undisputed that when Shibley denied the application, there *were* charges pending against plaintiffs that could have resulted in the revocation of their license. Whether the charges had been brought rightly or wrongly, Shibley had not caused them to be brought. Shibley, then, simply acted in accordance with a long-established policy, and he had no reason to believe that he was violating plaintiffs' rights. In fact, plaintiffs have presented no evidence that Shibley was even aware that there had been a prior plea agreement, nor have they shown that he ever treated similar petitions differently under comparable circumstances.

 It could also be argued that Shibley here did not perform a truly discretionary task, since Order 589 appears to have given him no choice but to deny the application.[4] Qualified immunity does not exist for constitutional violations arising from "ministerial," as opposed to discretionary, acts. *See, e.g., Antoine v. Byers & Anderson, Inc.,* 508 U.S. 429, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993); *Walz v. Town of Smithtown,* 46 F.3d 162, 169 (2d Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 2557, 132 L.Ed.2d 810 (1995). That principle, however, is applied when a government employee has a duty to perform a ministerial task and *refuses* to do so, not where he *does* perform it. *See, e.g., Antoine,* 508 U.S. 429, 113 S.Ct. 2167 (court reporter failed to comply with duty to provide convicted criminal defendant with transcript); *Walz,* 46 F.3d 162 (town highway superintendent refused to issue excavation permit to allow homeowners to obtain water service, despite his complete lack of discretion to deny permit under town code).

 Even if Shibley's act here was ministerial, then, he cannot be held liable. While "following orders" is not necessarily a defense in a § 1983 action, *Hare v. City of Corinth,* 36 F.3d 412, 416 n. 19 (5th Cir.1994); *J.H.H. v. O'Hara,* 878 F.2d 240, 244 n. 4 (8th

Cir.1989), *cert. denied,* 493 U.S. 1072, 110 S.Ct. 1117, 107 L.Ed.2d 1024 (1990), a government employee cannot be held individually liable for acts taken pursuant to official orders or regulations unless a reasonable person in his position should have known that his conduct violated clearly established constitutional rights. *Hare,* 36 F.3d at 416 n. 19; *J.H.H.,* 878 F.2d at 244 n. 4. That standard is essentially the same as the criterion for determining qualified immunity, so the result here is the same in any event. Even if Shibley knew about the prior plea agreement (and there is no evidence that he did), I find as a matter of law that he could reasonably have believed that his conduct did not violate plaintiffs' rights. The pending charges had been brought by the Board, were scheduled to be heard before an ALJ, and were outside Shibley's area of responsibility. Shibley had no duty or power to investigate, and come to his own independent conclusion as to whether the charges against plaintiffs had been properly brought, and he was therefore justified in proceeding in accordance with Order 589. *Cf. Walz,* 46 F.3d at 169 (town highway superintendent, in clear violation of town ordinances, refused to issue permit solely "as a means of extorting land from" homeowner applicants, and there was "no authority whatsoever that might have led [superintendent] to believe" that he could lawfully do so).

As with defendant MacCallum, I also find no basis for the claim against Shibley relating to the issuance of the suspension notice. There is no evidence that Shibley was in any way involved in the suspension proceedings.

## IV. Claims Against Duffy and Cuomo

 The claims against Duffy and Cuomo are based mostly on the events concerning the administrative charges filed against plaintiffs and the ensuing suspension order. Plaintiffs allege that Duffy and Cuomo were entirely or partly responsible for the revocation of the plea agreement, the decision to press ahead with a hearing on the

---

**4.** It is true that Justice Boehm found the denial of the application to be "without rational basis," but, since it is clear from the text of Order 589 that it did mandate denial of the application, and

since Justice Boehm did not state that Shibley himself had erred in applying the Order, it appears that Justice Boehm considered Order 589 itself to lack a rational basis.

charges after that revocation, and the decision to suspend plaintiffs' license. Plaintiffs also allege that Duffy and Cuomo knew that the charges were false, and that they, too, took part in the "public relations campaign" against plaintiffs. Plaintiffs further contend that Duffy and Cuomo refused to withdraw the denial of the permit application despite knowing that there was no sound basis for it.

■ With respect to Duffy's and Cuomo's decision to suspend plaintiffs' license, I find that they, like MacCallum, have absolute judicial immunity. In determining whether absolute quasi-judicial immunity should apply, the court must look at "the nature of the function performed [by the defendant], not the identity of the actor who performed it ..." *Forrester v. White,* 484 U.S. 219, 229, 108 S.Ct. 538, 545, 98 L.Ed.2d 555 (1988). Duffy's and Cuomo's roles in deciding to suspend plaintiffs' license were essentially adjudicative, and were similar to a judge's imposition of a sentence in a criminal case.

This result is directly supported by the Seventh Circuit's decision in *Reed v. Village of Shorewood,* 704 F.2d 943 (7th Cir.1983). In *Reed* (which surprisingly has not even been cited by the State defendants in the instant case, despite being directly on point), the Court of Appeals held that a local liquor-control commissioner had absolute judicial immunity in an action arising out of his decisions to revoke, or not to renew, the plaintiffs' liquor licenses. The court stated that it was "clear ... that the commissioner is acting in a judicial capacity when he revokes a liquor license," since he could not do so without finding, after notice and a hearing, that the licensee had violated the law. *Id.* at 951.

■ The court stated that "[t]he fact that a local liquor control commissioner is not a regular judge in a court of general jurisdiction can make no difference" in light of the Supreme Court's holding in *Butz* that it is the defendant's *function,* not his title, that is controlling. *Id.* at 952. The court noted that just as regular judges' decisions are appeal-

able, the commissioner's wrongs could be remedied through state processes. *Id.* at 951. The court further observed that just as with regular judges, forcing liquor commissioners to stand trial on the complaint of a disappointed litigant would make it difficult for them to carry out their duties. *Id.*

In addition to *Reed,* numerous other cases have held that officials empowered to make judicial-like decisions regarding the issuance, denial, renewal and revocation of licenses, including liquor licenses, are entitled to absolute quasi-judicial immunity for such acts. *See, e.g., Bettencourt v. Board of Registration in Medicine,* 904 F.2d 772, 783 (1st Cir.1990) (medical licensing board members); *Chiz's Motel v. Mississippi State Tax Comm'n,* 750 F.2d 1305, 1308 (5th Cir.1985) (tax commission officials, whose rescission of plaintiff's resort-area classification prevented plaintiff from being allowed to serve alcoholic beverages); *Burnett v. McNabb,* 565 F.2d 398, 400 (6th Cir.1977) (members of County Beer Board, who granted beer license to restaurant on condition that plaintiff, who had managed the restaurant, not work there); *Brossette v. City of Baton Rouge,* 837 F.Supp. 759, 763–64 (M.D.La.1993) (members of Alcoholic Beverage Control Board, whose decision to suspend plaintiff's license had been reversed by state court), *aff'd,* 29 F.3d 623 (5th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 443, 130 L.Ed.2d 353 (1994); *Rosenthal v. State of Nevada,* 514 F.Supp. 907, 913–14 (D.Nev.1981) (members of state Gaming Commission); *Hamm v. Yeatts,* 479 F.Supp. 267, 270–71 (W.D.Va.1979) (members of state Alcoholic Beverage Control Commission); *Brown v. DeBruhl,* 468 F.Supp. 513, 519 (D.S.C.1979) (members of state Beverage Control Commission).

■ In addition to deciding what penalty to impose on plaintiffs, Duffy and Cuomo also had a role in deciding to pursue the charges against plaintiffs. In that regard, however, their actions were akin to those of a prosecutor in deciding whether to bring charges against someone.[5]

---

5. Though plaintiffs do not contend that Duffy's and Cuomo's performance of both judicial and prosecutorial functions is objectionable (indeed, given the immunity afforded to both judges and

prosecutors, plaintiffs do not concede that they acted in either capacity), "[t]here is nothing constitutionally infirm about [defendants] performing both prosecutorial and adjudicatory func-

■ Under well-established case law, however, prosecutors are absolutely immune from liability for such actions. "[I]n initiating a prosecution ..., the prosecutor is immune from a civil suit for damages under § 1983." *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 994, 47 L.Ed.2d 128 (1976). Without such immunity, the threat of § 1983 suits could easily undermine the prosecutor's performance of his duties, since the prosecutor would then be "constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages." *Id.* at 424–25, 96 S.Ct. at 992. *See also Day v. Morgenthau,* 909 F.2d 75, 77 (2d Cir.1990); *Schloss v. Bouse,* 876 F.2d 287, 289 (2d Cir.1989); *Lawson v. Abrams,* 863 F.2d 260, 262–63 (2d Cir.1988); *Taylor v. Kavanagh,* 640 F.2d 450, 452 (2d Cir.1981). Since Duffy's and Cuomo's actions in this regard were functionally equivalent to that of a prosecutor, they are absolutely immune in a suit for damages. *Cf. Austin Mun. Securities,* 757 F.2d at 689 (disciplinary officers of securities association were absolutely immune for prosecutorial acts in deciding which charges to bring against securities firm, and for judicial acts in adjudicating firm's guilt).

■ They are also entitled to absolute immunity for their decision not to proceed under the plea agreement. Like the decision to bring a prosecution, a "prosecutor's activities in the plea bargaining context merit the protection of absolute immunity." *Taylor,* 640 F.2d at 453.

As with the other defendants, I find no foundation for plaintiffs' allegations that Duffy and Cuomo engaged in a smear campaign to ruin plaintiffs' business, or that they conspired with each other or Paul to do so. These allegations are quite vague and lack factual support. Such claims of conspiracy cannot stand. *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993); *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993); *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir.1990), *cert. denied,* 499 U.S. 937, 111 S.Ct. 1389, 113 L.Ed.2d 446 (1991); *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987); *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977).

The only evidence that plaintiff offers for these allegations is the Board's issuance to the local police of a notice of suspension regarding the Lincoln after the Board had decided to suspend plaintiffs' license. As noted earlier, however, there is no evidence that this was anything other than a standard notice issued in the ordinary, normal course of events whenever the Board imposed a penalty of suspension upon a licensee. Plaintiffs' allegations that the Board, by issuing the notice, "caused" the police to spread word that the closing of the Lincoln was imminent also fails to state a claim. First, there is no showing that the Board "caused" the police to do anything. Furthermore, even if word of the suspension decision was disseminated, I fail to see any constitutional violation in that regard.

Finally, there is no · evidence to support plaintiffs' claims that the State defendants conspired with Paul to damage plaintiffs' reputation or destroy plaintiffs' business. Although Paul was involved in some of the underlying events, and his complaints may have played a part in the SLA's investigation of plaintiffs, plaintiffs simply have not come forward with any evidence that Paul and the State defendants acted in concert. Rather, the record shows that the State defendants undertook their own independent investigation of these matters. Whatever rumors or accusations Paul may have spread through the community, there is no showing that the State defendants were involved.

## V. Claims Against David Paul

■ Defendant Paul has not moved for summary judgment. However, in light of my decision regarding the State defendants, it is apparent that the claims against him must be dismissed as well. It is well settled that summary judgment may be rendered in favor of a non-moving party if the undisputed facts show that he is entitled to judgment as a matter of law. *See Project Release v. Prevost,* 722 F.2d 960, 969 (2d Cir.1983);

tions." *Austin Mun. Securities, Inc. v. National Ass'n of Securities Dealers, Inc.,* 757 F.2d 676, 689 (5th Cir.1985) (citing *Withrow v. Larkin,* 421 U.S. 35, 56–57, 95 S.Ct. 1456, 1469, 43 L.Ed.2d 712 (1975)).

*Lowenschuss v. Kane,* 520 F.2d 255, 261 (2d Cir.1975).

■ The only federal claim against Paul is the first cause of action under 42 U.S.C. § 1983, which alleges that Paul conspired with the State defendants to violate plaintiffs' rights. A private individual may be said to have acted "under color of state law," and thus may be held liable under § 1983, if he has conspired with state officials, that is, that he "somehow reached an understanding" with state officials, or was a "willing participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970). Absent evidence that such a conspiracy or joint activity took place, however, no § 1983 liability can attach to a private individual because the "under color of law" requirement is not satisfied. *Id.*

As already stated, however, there is no evidence that Paul conspired with the State defendants in any way. The mere fact that both he and they were involved in some of the events giving rise to this suit does not suffice to show that they acted pursuant to some sort of agreement or understanding.

■ Paul's activities here are analogous to those of a citizen who reports someone to the police. It is uniformly recognized, however, that a private party does not conspire or jointly act with a state actor simply by complaining to the police. *See, e.g., Collins v. Womancare,* 878 F.2d 1145, 1155 (9th Cir. 1989), *cert. denied,* 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990); *Carey v. Continental Airlines, Inc.,* 823 F.2d 1402, 1404 (10th Cir.1987); *Sims v. Jefferson Downs Racing Ass'n,* 778 F.2d 1068, 1078–79 (5th Cir.1985).

■ Even "providing false information to an arresting officer is not, by itself, sufficient to state a claim against that private party under § 1983." *Moore v. Marketplace Rest., Inc.,* 754 F.2d 1336, 1352 (7th Cir. 1985). "[T]here must be some evidence of some *concerted effort* or *plan* between the private party ... and the state official ...". *Id.* at 1352–53 (emphasis added). Similarly, private misuse of a state statute is not conduct that can be attributed to the state.

*Dahlberg v. Becker,* 748 F.2d 85, 90 (2d Cir. 1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985).

■ To establish § 1983 liability based upon an alleged conspiracy with a public official, then, there must be some evidence, circumstantial or direct, upon which the jury could infer that the private party and the state actor had a "meeting of the minds" and thus reached an understanding that the plaintiff should be deprived of some right. *Adickes,* 398 U.S. at 158, 90 S.Ct. at 1609. "[T]he Supreme Court [has] stressed that the fact to be alleged *and proved* [i]s that 'the [private and state actors] had a 'meeting of the minds' and thus *reached an understanding* " to deprive the plaintiff of his rights. *Annunziato v. The Gan, Inc.,* 744 F.2d 244, 250 (2d Cir.1984).

As stated, there is no evidence that such a meeting of the minds occurred between Paul and any of the State defendants. Paul's role as a complaining witness cannot be characterized as under color of state law, and nothing else in the record indicates that he and the State defendants were consciously acting in concert in pursuit of a common goal.

■ The only federal claim against Paul having been dismissed, I decline to exercise jurisdiction over the remaining state-law claim against him. 28 U.S.C. § 1367; *see Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 104 (2d Cir.1990). The dismissal of that claim is without prejudice to whatever remedies plaintiffs might have against Paul in state court.

### CONCLUSION

Defendants' motion for summary judgment (Item 46) is granted, and the complaint is dismissed against all defendants.

IT IS SO ORDERED.